1           UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF VIRGINIA
2                 DANVILLE DIVISION

3  **UNITED STATES OF AMERICA,**

4                     Plaintiff,
                                    **No. 4:12-CR-1-4**
5      vs.                          Danville, Virginia
                                    **February 19, 2013**
6  **QUENTIN DWAYNE McNEBB,**

7                     Defendant.

8          **TRANSCRIPT OF SENTENCING PROCEEDINGS**
          BEFORE THE HONORABLE JACKSON L. KISER
9              UNITED STATES DISTRICT JUDGE.

10  **APPEARANCES:**

11  **For the Government:**

12  **DONALD RAY WOLTHUIS**
   United States Attorneys Office
13  BB&T Building
   301 First Street, S.W., Room 906
14  Roanoke, VA 24008
   540-857-2250

15


16  **For the Defendant:**

17  **JAMES CLINTON TURK, JR.     STUART J. PEARSON**
   Harrison & Turk, PC         Gardner, Barrow, Sharpe & Pearson
18  1007 East Main Street       500 Piney Forest Road, Suite B
   Radford, VA 24141           Danville, VA 24540
19  540-639-9056                434-799-1422

20


21  Court Reporter:   Carol Jacobs, Official Court Reporter
                    Registered Diplomate, Realtime Reporter
22                  U.S. District Court
                    1101 Court Street
23                  Lynchburg, VA 24504
                    434-847-5722, ext. 3

24
       Proceedings recorded by mechanical stenography;
25  computer-assisted transcription.

1    (Call to Order of the Court at 10:55 a.m.)

2         THE COURT:  Good morning, folks.

3         Both sides ready to proceed with Mr. McNebb?

4         MR. PEARSON:  Yes, Your Honor.

5         THE COURT:  All right.  I'm aware of the fact that

6    there is a motion for substantial assistance, but I will

7    make the required findings first.

8         I will adopt the report as written.  There are no

9    prefiled objections.

10        Each count attained a base offense level of 43.

11   And there is an adjustment for multiple counts.  The

12   adjustment produces a total number of units of two.  And

13   that is added to the 43, producing a combined adjusted

14   offense level of 45.  Three points' credit for accepting

15   responsibility, producing a total offense level of 42.

16        There are ten criminal history points, producing a

17   category V criminal history.

18        With an offense level of 42 and a criminal history

19   of V, the custody range under the guidelines is 360 months

20   to life; the supervised release range is two years to life;

21   the fine range is 25,000 to $250,000; and a special

22   assessment of $200.

23        Having made those findings, Mr. Wolthuis, I'll hear

24   you on your motion for substantial assistance.

25        MR. WOLTHUIS:  Your Honor, if it please the Court,

1  what I would like to do is call my agent just briefly for

2  some matters that may relate probably more to our

3  recommendation than the substantial assistance motion.

4          THE COURT:  All right, sir.  That's fine.

5          MR. WOLTHUIS:  I call Special Agent Mike Cilento.

6           MIKE CILENTO, GOVERNMENT'S WITNESS, SWORN

7          THE WITNESS:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9                  DIRECT EXAMINATION

10  BY MR. WOLTHUIS:

11  Q.  Special Agent Cilento, would you please identify

12  yourself for this Court.

13  A.  Yes.  Special Agent Mike Cilento, Special Agent ATF,

14  Roanoke.

15  Q.  And how long have you been with the ATF?

16  A.  Approximately 11 years.

17  Q.  And were you the lead federal investigator on the case

18  that Mr. McNebb now stands before the Court?

19  A.  Yes, I was.

20  Q.  And as lead investigator, did you have a chance to

21  personally interview many, if not most, of all of the

22  witnesses and the defendants in the case in the preparation

23  of this case for trial?

24  A.  Yes, I did.

25  Q.  And what I would like to do is ask you, first of all,

1    do you recall when you first interviewed Mr. McNebb as a

2    part of this case?

3    A.   Yes, I do.

4    Q.   And what was that date?

5    A.   That was 3/10/2010.

6    Q.   And as a part of that interview, was he -- was it

7    inquired of him whether or not he was actually a member of

8    the Nine Trey Blood gang at that time?

9    A.   Yes, it was.

10   Q.   And what was his indication to you at that time?

11   A.   On that date Mr. McNebb stated that he's affiliated

12   with the Bloods, but not a member, on that date.

13   Q.   And then he was brought before the grand jury roughly

14   15 days later; is that correct?

15   A.   Correct.

16   Q.   And on that occasion did he restate that he was an

17   associate, but not a gang member?

18   A.   Correct.

19   Q.   And then, as the investigation went further, did you

20   gather more information that he was an active member of the

21   gang?

22   A.   Yes, we did.

23   Q.   And did -- was Mr. McNebb brought back before the grand

24   jury and reinterviewed on January the 13th, 2011?

25   A.   Yes, he was.

1  Q.  And was Mr. McNebb more forthcoming at that time about

2  his actual relationship or membership in the gang?

3  A.  Yes, he was.

4  Q.  And at that time did he acknowledge he was a gang

5  member?

6  A.  He did.  He stated he was a captain in the gang.

7  Q.  And did he also point out that he had been, quote,

8  blessed into the gang, as opposed to beat in, as a function

9  of his age?

10  A.  That's what he said, yes.

11  Q.  Now, as a part of your investigation, did you have an

12  occasion to interview a woman by the name of Courtney

13  Wright?

14  A.  Yes, I did.

15  Q.  And do you recall what the date was of that interview?

16  A.  The interview in question I believe was 5/25/2010.

17  Q.  And was she also brought before the grand jury about

18  the 7th day of October, 2010?

19  A.  Yes, she was.

20  Q.  And at both that interview and that grand jury, was she

21  asked about her knowledge or exposure to the defendant,

22  Mr. McNebb?

23  A.  Yes, she was.

24  Q.  And did she describe a particular meeting of the gang

25  where Mr. McNebb appeared to have a leadership role?

1    A.   She did.  She said that at one of these meetings that

2    they had -- she stated when "Fatal" was caught in Michigan,

3    the Bloods had a meeting to discuss what was going to happen

4    with the gang.  And she stated that during that meeting that

5    "QB," Mr. McNebb, seemed to be in charge of that meeting.

6    Q.   And did he make any statement about his involvement or

7    longevity with the gang?

8    A.   Her statement was that "QB," Mr. McNebb, made a comment

9    during that meeting, stated, "I have been banging longer

10   than most of you have been alive."

11   Q.   And did you, as a part of this investigation, also have

12   a chance to interview the codefendant, one of the actual

13   shooters, Keith "Fatal" Hairston?

14   A.   Yes, I did.

15   Q.   And did you speak with Mr. Hairston about what

16   knowledge Mr. McNebb gained about the robbery before it took

17   place?

18   A.   Yes, I did.

19   Q.   And was that interview on about the 13th day of May,

20   2010?

21   A.   One second.  Correct.  5/13/2010.

22   Q.   And that was after Mr. Hairston was arrested in

23   Michigan and brought back and given counsel; is that

24   correct?

25   A.   That is correct.

Q.   And what did Mr. Hairston advise that he had told

Mr. McNebb of what was going to happen that day, when the

murder took place?

A.   Mr. Hairston stated that when all of the individuals in

question got into Mr. Armour's Volvo in Eden, North

Carolina, he made a statement to the group that "We got a

lick," which is a street slang for "We have a robbery."  And

that Mr. McNebb looked at Mr. Hairston and made the

statement, "Enough said."

Q.   And what did you take "Enough said" as to mean?

A.   "I understand what you are saying and, you know, let's

do it."

Q.   Basically an acknowledgment --

A.   An acknowledgment that they understood what he was

talking about and what the plan was.

Q.   And he didn't ask to get out of the car or anything at

that point?

A.   No.

Q.   And was there any discussion in or around that time

that Mr. McNebb was advised that he would share in the

proceeds from the robbery of the marijuana?

A.   Mr. Hairston stated that when he told the group,

specifically Mr. McNebb, that they had a lick and he stated,

"Whatever I get from the robbery, I will split with you,"

meaning the group.

1  Q.  And then going back to Mr. McNebb's very first

2  interview on the 10th of March, 2010, did he acknowledge to

3  you at that point that he fully expected to receive a share

4  of the robbery proceeds?

5  A.  Yes.  According to Mr. McNebb's statement, he stated

6  that Mr. Hairston told them, "We're about to hit a lick.

7  We're going get V."  He told them, "You-all post up and come

8  back and get us.  You-all are going to get some weed from

9  this."  Mr. McNebb further stated that he understood the

10  plan that they were going to rob Von for the marijuana and

11  they were all going to split it.

12  Q.  Now, drawing your attention to Mr. McNebb's second

13  grand jury testimony on the 13th day of January, 2011, I

14  believe page 14 of that document, did Mr. McNebb explain to

15  the grand jury, even though he wasn't the shooter or the

16  driver, kind of what his role was in the car on that day as

17  a part of this robbery?

18  A.  Yes, he did.  He stated that they got to the bottom of

19  the hill at the stop sign and they got out, meaning

20  Mr. Hairston and Mr. Thomas.  They said, "Let me out right

21  here and wait over at the top of the hill."

22      And the question was asked:  "So they instructed you to

23  go and wait until they hit their lick?"

24      The answer was "Yes."

25      And he basically stated that it was everybody else's

1  job just to do whatever was asked of them.  He understood

2  that Mr. Thomas and Mr. Hairston were going to actually

3  commit the robbery, and that him and Mr. Armour were there

4  to do whatever was asked of them.

5  Q.  Now, after the robbery, did you -- or, excuse me, as a

6  part of your investigation, did you have a chance to speak

7  to the codefendant, the second shooter, Tremain Thomas, on

8  the 7th day of April, 2010?

9  A.  Yes, I did.

10  Q.  And during that interview did you have a chance to talk

11  with Tremain Thomas about what Mr. McNebb's concerns were

12  following the robbery and murder as it related to the

13  marijuana?

14  A.  Yes.  Mr. Thomas stated that out of everybody involved

15  in this investigation, that Mr. McNebb was the most

16  concerned about the proceeds of the robbery.  He wanted to

17  know where the marijuana was and when he was going to get

18  his cut.

19  Q.  Did Mr. Thomas or anyone else in this investigation

20  ever indicate that Mr. McNebb was concerned about Mr. Murphy

21  or his family or what had happened as a result of this

22  robbery and murder?

23  A.  No, he was not.

24  Q.  Now, when you interviewed Mr. McNebb back in March of

25  2010, did he also acknowledge there was a conversation

1  following the murder about where the drugs were?

2  A.   Yes.   Mr. McNebb stated that when him and Mr. Thomas

3  went back in North Carolina, in Durham, North Carolina, that

4  evening, that they had a conversation about what

5  Mr. Hairston got proceeds-wise.   And Mr. McNebb stated that

6  Mr. Thomas said, "I believe he got it.   It was so big he

7  couldn't take it.   He left it in the woods," speaking of the

8  marijuana.

9  Q.   So Mr. McNebb's version of that conversation as to who

10 said what was slightly different, but the fact of the

11 conversation he confirmed?

12 A.   Correct.

13         MR. WOLTHUIS:   Those are all the questions I have

14 of this witness, Your Honor.

15         THE COURT:   Cross-examination by the defense?

16                 CROSS-EXAMINATION

17 BY MR. PEARSON:

18 Q.   Special Agent Cilento, did Mr. McNebb explain to you

19 why he first said he was only affiliated with the gang and

20 then later said he was a member of the gang?

21 A.   I don't remember a specific reason why he said that,

22 no, sir.

23 Q.   Do you recall him telling you that he was blessed into

24 the gang?

25 A.   Yes, sir; I do recall that.

1   Q.   And -- I mean, how do people typically become a gang

2   member?

3   A.   It has been my experience, with this gang and a few

4   others that I have dealt with, that the typical experience

5   for being initiated into the gang is to be beat in, meaning

6   you have to fight.  In this case, with the Nine Treys, you

7   have to fight three people for 31 seconds.  And that's

8   -- and if you make it through that, then you are in the gang

9   -- or that's the first step to being brought in.

10          THE COURT:  Three people all at the same time?

11          THE WITNESS:  Yes, sir.

12          And according to Mr. McNebb, he stated that he did

13  not have to go through that process; that because of his age

14  and because of his status, I guess, in the community, they

15  blessed him in.  That was the first time I had ever heard of

16  that happening.  Yes.  So, yes, I do recall that

17  conversation, but I don't recall why he said -- he didn't

18  tell us in the first interview but told us later, to answer

19  your question.

20  BY MR. PEARSON:

21  Q.   You mentioned Courtney Wright's name?

22  A.   Correct.

23  Q.   Is that a female?

24  A.   Yes, it is.

25  Q.   And did she have any charges that came out of this

1  investigation?

2  A.   No, sir, not at this time.

3  Q.   Not at the state level or federal level?

4  A.   Yes, some state charges on this case, yes, sir.

5  Q.   So she did have some involvement in this matter that

6  the state took care of; is that correct?

7  A.   To my knowledge, yes, that has been adjudicated.

8  Q.   And I think you had testified that she is the one that

9  mentioned "QB" being in charge of some meeting, discussing

10  "Fatal"?

11  A.   That is correct.

12  Q.   And, of course, you discussed Mr. Thomas' version being

13  different, I think, from Mr. McNebb's version as it applies

14  to the proceeds and the concern of the marijuana; correct?

15  A.   The difference, sir, was not in the conversation.  The

16  conversations were the same.  The difference is Mr. McNebb

17  stated that this conversation happened at one location;

18  Mr. Thomas stated that this conversation happened at a

19  different location.  But the elements of the conversation

20  were still the same.

21  Q.   And is this the same Mr. Thomas that stands charged as

22  a codefendant?

23  A.   Yes, sir, it is.

24  Q.   That's the Mr. Thomas you are talking about?

25  A.   Yes, sir, it is.

1  Q.  The first time that you met with Mr. McNebb, he was

2  incarcerated in prison; correct?  Or do you recall?

3  A.  He was incarcerated.  I'm not -- I don't recall where

4  he was incarcerated at the time.  I thought he was at the

5  Martinsville City Jail at the time.

6  Q.  Okay.  He was either, I guess, pulling time or about to

7  pull time on a state charge when you first met with him?

8  A.  Yes, sir.  He was -- at the time of this crime that

9  we're here for today, he was actually on the run on state

10  charges.  And he had been picked up on those charges, I

11  believe, at that time.

12  Q.  Those state charges don't have anything to do with

13  these federal charges?

14  A.  No, sir.

15  Q.  They were completely separate?

16  A.  Yes, sir.

17  Q.  All right.  And so you met with him in March of 2010?

18  A.  I did.

19  Q.  You met with him again -- do you recall the date?

20  A.  One second.

21     January 2011 I'm aware of, and there may be a third

22  occasion.

23  Q.  So you possibly met with him three times, definitely

24  met with him twice?

25  A.  Yes, sir, Mr. McNebb.

1  Q.  With Mr. McNebb.

2  A.  Correct.

3  Q.  He did not have counsel present during any of those

4  meetings?

5  A.  I know he didn't during the first one.  And I don't

6  believe he had an attorney during the second one.  Yes, sir.

7  Q.  He has also testified on two different occasions in

8  front of the grand jury?

9  A.  That is correct.

10  Q.  Special Agent Cilento, I do not have any other

11  questions for you.

12  A.  Thank you.

13         THE COURT:  Any redirect, Mr. Wolthuis?

14         MR. WOLTHUIS:  No, Your Honor.

15         THE COURT:  You may step down.

16         THE WITNESS:  Thank you, sir.

17         MR. WOLTHUIS:  That would be our evidence, Your

18  Honor.

19         THE COURT:  Let's address the issue of the motion

20  at this point.

21         MR. WOLTHUIS:  Your Honor, I would make these

22  representations to the Court.  And if we need to re-call

23  Agent Cilento, the defense or the Court certainly can do so.

24  But the basis of the motion for substantial assistance is

25  this:  is that at the time we talked to Mr. McNebb the first

time and he went before the grand jury the first time, he was cooperative and forthcoming, with the exception of the fact of his gang membership.  And he was able to confirm many things that were important.  One had to do with who the actual participants were.  Now, we had heard that from other members of the conspiracy at this time, but things had not solidified yet and we were still trying to corroborate and pin things down.

He was also able to give us another version of the sequence of events that helped us believe and understand what had happened.

And, finally, the information he gave us had to do with the role of the individuals participating in it, because obviously there's a big difference if somebody is a trigger person or not or a person is a leader or the follower.  And he was able to add to our understanding of the events of that day.

He also has made himself available throughout.  In the event any of the defendants were to go to trial, it is our assessment he would have been a substantial and valuable witness.

The bottom line on this is that this Court has previously noted that this type of assistance is not the most valuable in the world.  And we do not disagree with that.  But we do believe it is the kind of assistance that

1   does warrant a motion and does warrant the Court granting

2   such a motion.

3         And I think it is important that his assistance

4   does both assist the government and the Court in

5   understanding the particulars of this case and in avoiding

6   the possibility of a costly trial, preparation and trial,

7   that could have been but for his and other people's

8   willingness to testify.

9         So we would ask that the motion be granted on that

10  limited basis.

11        THE COURT:  Response by the defense?

12        MR. PEARSON:  May it please the Court.

13        Your Honor, we would also ask that you accept this

14  motion.

15        As you have heard from the government, on that very

16  first encounter with Special Agent Cilento, Mr. McNebb was

17  able to corroborate important information.  He cooperated

18  from that point forward.  He added additional information

19  that assisted in the investigation of this matter.  At no

20  time did he withdraw his assistance or not follow through

21  with assistance in this matter.  We ask that you take that

22  into account in considering the motion.

23        THE COURT:  Well, as I indicated at the last

24  hearing for -- I guess it was Keith Hairston, the assistance

25  is minimal at best, but I will follow the same procedure and

grant the motion, but, in so doing, advise that I don't think the assistance was extremely valuable to the government. But I will grant the motion.

Having done that, I'll entertain any evidence that the defense has to offer.

I have read the submission, Mr. Pearson, that you sent and read the letters supporting Mr. McNebb. And I would be glad to hear any additional evidence at this time.

MR. PEARSON: Your Honor, we would have no additional evidence.

THE COURT: I'll hear argument at this time, from the government.

MR. WOLTHUIS: Thank you, Your Honor.

If it please the Court, I would characterize this case as being a team effort, and that Mr. McNebb was on the team; he was suited up, on the bench, ready to play; and that was his role in this offense.

Obviously the devastation of this murder, the senseless murder, is profound. Not only is it to Mr. A.J. Murphy, who lost his life, but to his family, who lost a son, lost a father, lost a brother, a grandson, and also to the community that not only lost a member, but to the peaceability and safety of the community that was seriously torn and disrupted by this murder.

I think it is important to try to put Mr. McNebb's

involvement in the context.  And I would recite several factors that I think would help to do that.

Number one, this was a gang killing.  Number two, Mr. McNebb was a member of the gang.  According to Courtney Wright, he was a member of the gang who described himself as "having been banging longer than most of you have been alive."

Mr. McNebb also has a serious criminal record:  as the Court has already noted, ten criminal history points, with a category of V, multiple felonies, multiple drug felonies, and at least one of those drug felonies involved the possession of a firearm.

This case also arose while Mr. McNebb was a fugitive from justice in Virginia, hiding out in North Carolina.  And it is interesting to notice what -- according to Keith Hairston, what his response was when he found out that they weren't just going to Virginia to procure marijuana, but they were going to rob somebody, and he said, "Enough said.  I'm all in.  I'm ready to play, Coach"; as Mr. McNebb told the grand jury, that he basically was there to do whatever was asked of him of the gang leaders.

And it is interesting what his reaction was. Somebody has been killed, and his reaction appears to have been, from what he said -- or what Mr. Thomas said, that his concern was not with the death of another individual, but

with his share -- paltry share of this 10 or 12 pounds of marijuana.

Now, there are some mitigating facts that I would point out to the Court in this case. It is important to notice that Mr. McNebb was not the one who planned this robbery and murder. He was not the trigger man. There possibly may have been some element of coercion or peer pressure, because he was a captain in the gang, being ordered by the generals. But I think that in some way is softened by the fact that he's older than these other guys and hopefully would possess greater or deeper judgment.

It is important to note that he is the only person charged and convicted in this case who actually didn't do anything except agree with the enterprise and make himself available to act if called upon to do so.

And the final factor that would be suggestive of mitigation, to the extent that it is a factor, would be the substantial assistance motion that the Court has just considered.

All of that being said, Your Honor, I would say that this was a team effort. McNebb was there on the team, ready to act. And while it is notable that he was not one of the shooters or planners, it certainly does not take anything away from the seriousness of this offense or his participation in it.

1    The plea agreement in this case, Your Honor -- and

2    I would ask the Court to follow the plea agreement -- called

3    for a minimum of five years and a maximum of 20 years.  And

4    I would suggest to the Court that a sentence toward the

5    upper end of that range may well be appropriate in this

6    case.

7         Thank you.

8         THE COURT:  Mr. Pearson.

9         MR. PEARSON:  May it please the Court.

10        These are always difficult cases.  We're dealing

11   with real life, real death.  You know, this is not some show

12   on television.  There's real pain involved.  You have, you

13   know, one life extinguished and you have another life

14   ruined.

15        The case, from our point of view, is more about

16   relative culpability than anything else.  That was the

17   essential argument in the memorandum previously filed in the

18   court.  We would stand on the argument put forth in that

19   sentencing memo.

20        We would ask the Court to consider directing

21   Mr. McNebb into the drug treatment program.

22        We would ask for him to be placed at Butner, North

23   Carolina, and for any other recommendations that the Court

24   believes would be beneficial to him in his time that he

25   receives.

1        We would ask for the Court to consider a sentence

2   closer to the low end of the bracketed range.

3        Thank you, Your Honor.

4        THE COURT:  Mr. McNebb, the law gives you the right

5   to address the Court personally, if you choose to.  And if

6   you choose to, I'll hear you now.

7        Come to the lectern, please.

8        THE DEFENDANT:  I would like to apologize to the

9   family to whom this may have affected.  I would like to

10  apologize to my family for taking them through this ordeal.

11  I was in the wrong place at the wrong time, as often that

12  happens.  I know the family.  They know me.  I'm not that

13  type of individual.  Like I said, I was in the wrong place

14  at the wrong time.

15       I would like to extend my appreciation to my

16  lawyers for their representation on my behalf.

17       I now know that bad decisions can cause big

18  problems.

19       That's all I have to say.

20       THE COURT:  All right.  You may return to counsel

21  table.

22       Well, if it was a bad decision, it seems like,

23  Mr. McNebb, that you have made several of them in the past.

24  You have garnered ten criminal history points, with a

25  category V criminal history.  You have gotten your points

basically on drug dealings.

        And the substantial assistance, I think, is worth consideration, but minimal consideration.

        You and the government have agreed that the sentence should fall between 60 and 240 months.  But for that agreement, I would have gone above 240 months, would have probably gone to the bottom of the guidelines.  But I'm very conscious of the parties ought to get the benefit of a bargain, so I will stay within the agreement, but only because of the agreement.

        If you'll stand up, Mr. McNebb, I'll impose the sentence.

        Based on the comments I have already made as well as other considerations under Section 3553(a), it is the judgment of the Court that you be confined by the Bureau of Prisons to be imprisoned for a total of 240 months.  And that's 240 months on Count One and 240 months on Count Three -- excuse me.  That would be 60 months on Count One -- I haven't done the math -- and 180 months on Count Three, to be served consecutively.

        I will recommend to the Bureau of Prisons that you be given an opportunity to participate in a drug treatment program.  When you are released from confinement, you will be on supervised release for five years.  And that's five years on each count, to run concurrently.

You'll have to report to the probation office in the district in which you are released within 72 hours of your release.

And while on supervised release, you must comply with these mandatory conditions of supervision. You are not to commit any further crimes, federal, state, or local. You are not to unlawfully possess or unlawfully use a controlled substance. You will be required to take a drug test within 15 days of your release from confinement and two required tests thereafter, and they will be scheduled by the probation officer. You are not to possess a firearm, ammunition, destructive device, or any other dangerous weapon; and you are to live in a residence free of those items. You must cooperate with the probation officer in the collection of DNA samples. And you must comply with the standard conditions of supervision which have been adopted by this court.

You'll be required to pay the $200 special assessment, which is due and payable as of now.

In addition to the mandatory drug testing, you will participate in an ongoing testing and treatment program for substance abuse as approved by the probation officer. You'll be subject to a warrantless search and seizure of your person and property -- and that would be at the direction of the probation officer -- to determine whether

1   you have illegal drugs or firearms.

2       You shall not associate with any known gang members

3   or be in the presence of those members that are known to you

4   as gang members. You are not to wear or display or possess

5   any article that would evidence membership in a gang.

6       You are not to frequent any school grounds, unless

7   attending as a student at the school or the parent or legal

8   guardian of such child.

9       You don't have the ability to pay a fine, so one

10   will not be imposed.

11       According to the plea agreement, Count Two is

12   hereby dismissed.

13       Now, Mr. McNebb, in your plea agreement you waived

14   your right to appeal. And so far as I know, that waiver is

15   binding on you. Should you, however, decide that you want

16   to appeal your case for reasons sufficient to yourself, you

17   must undertake that appeal within 14 days from today. And

18   you may take the appeal by -- without prepayment of any fees

19   or costs. And you would be entitled to court-appointed

20   counsel. And should you be unable to -- or should your

21   lawyers be unable to file the notice of appeal for you, you

22   can do it yourself by simply calling the clerk's office,

23   telling the clerk that you want to appeal your case, and an

24   appeal will be noted for you.

25       Anything further, Mr. Pearson?

1        MR. PEARSON:  No, Your Honor.

2        THE COURT:  By the government?

3        MR. WOLTHUIS:  No, Your Honor.

4        THE COURT:  All right.  You'll have to return to

5   the custody of the marshal.

6        MR. TURK:  Thank you, Your Honor.

7        THE COURT:  I understand we have a jury verdict.

8   So as soon as the courtroom is in proper order, you can

9   bring the jury in.

10      (Thereupon, these proceedings were adjourned at

11   10:40 a.m.)

12

13

14                    EXAMINATION INDEX

15
     MIKE CILENTO, GOVERNMENT'S WITNESS
16       DIRECT BY MR. WOLTHUIS                          3
         CROSS BY MR. PEARSON                           10
17

18

19

20

21      I certify that the foregoing is a correct transcript

22   from the record of proceedings in the above-entitled matter.

23        ____/s/ Carol Jacobs___              April 4, 2014
         Official Court Reporter                  Date
24

25